IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

White Mule Company, et. at.,                    Case No: 3:07CV00057

        Plaintiffs,

     v.                                             ORDER

ATC Leasing Company LLC, et. al.,

        Defendants

This antitrust action arises under §§ 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1 and 2. Plaintiffs, White Mule Company and its owners, L. Steven Ritchey and Deborah K. Ritchey, both individually and as trustees of the L. Steven Ritchey Living Trust and the Deborah K. Ritchey Living Trust [collectively White Mule], allege that defendants, ATC Leasing Company LLC and affiliated corporations [collectively ATC or ATC Leasing], engaged in numerous antitrust violations in an effort to control the market for delivery of new class six, seven, and eight trucks from manufacturers to customer in North America [Relevant Market One]. White Mule claims that, to achieve this objective, ATC obtained invalid patents and used those patents to exercise and maintain monopsony and monopoly power in the market for the design and manufacture of saddles, decking booms, and other connection devices [Relevant Market Two] used in the delivery of trucks in Relevant Market One.

Plaintiffs also assert state and federal law claims for product disparagement, defamation, unfair competition, and breach of contract. Plaintiffs seek a declaratory judgment regarding the validity of the patents in question. Jurisdiction is proper under 28 U.S.C. §§1331, 1337, and 1367.

1

ATC moves to dismiss the antitrust, Lanham Act, and state law claims [Doc. 44]. Defendants also assert that this court lacks subject matter jurisdiction over the patents in question because ATC has disclaimed those patents, denying them any force or effect.

For the reasons that follow, I grant defendants' motion with regard to the antitrust claims except for those alleging *Walker Process* attempted monopolization of Relevant Market Two.[1] I also grant ATC's motion to dismiss the plaintiffs' request for a declaratory judgment that the relevant patents are invalid and dismiss L. Steven and Deborah K. Ritchey's claims as individuals and trustees.

With regard to the plaintiffs' state tort and Lanham Act claims, I dismiss the Lanham Act claim in its entirety and the product disparagement and defamation claims except to the extent that they relate to ATC's statement that I granted a temporary restraining order against the plaintiffs. I deny the defendants' motion to dismiss plaintiffs' breach of contract claim.

## Background

---

[1]

In *Walker Process*, plaintiffs Food Machinery & Chemical Corp. filed suit alleging that Walker violated Food Machinery's patent. In response, Walker denied the infringement and, later, counterclaimed, charging that Food Machinery had engaged in an illegal monopoly "by fraudulently and in bad faith" maintaining its patent. *Walker Process Equip., Inc. v. Food Mach. and Chem. Corp.*, 382 U.S. 172, 174 (1965). Therefore, rather than just claiming fraud, the defendant "prayed that Food Machinery's conduct be declared a violation of the antitrust laws and sought recovery of treble damages." *Id.*

Citing the long tradition of injured parties "attack[ing] the misuse of patent rights," the Court held that "[t]o permit recovery of treble damages for the fraudulent procurement of the patent coupled with violation of s 2 accords with these long recognized procedures." *Id.* at 176-77. A plaintiff making such a claim, however, would have to make two showings: 1) the patent applicant "knowingly and willfully misrepresent[ed] facts to the Patent Office" (stripping the applicant of its exemption from antitrust laws) and 2) the illegal patent provided exclusionary power in the relevant market. *Id.* at 177; *see also id.* at 179 (Harlan, J., concurring).

2

White Mule is an Ohio corporation that manufactures products that other companies use to transport trucks. White Mule's products include saddles, decking booms, and parts for breaking units. L. Steve Ritchey and Deborah K. Ritchey are trustees and beneficiaries of two living trusts which own 100 percent of the outstanding stock of White Mule.

Defendants are a group of companies engaged in the business of transporting trucks across North America. ATC Leasing Company LLC is a subsidiary of co-defendant JHT Holdings, Inc., which owns and controls the affiliated defendant companies. The defendant companies operate as a single economic entity under common control.

White Mule's products allow a lead vehicle to transport multiple trucks. Known as decking, this method is the predominant and most economically and technically efficient means of delivering new class six, seven, and eight trucks.[2] To compete in the truck delivery market, a truck delivery company needs connecting equipment.[3] Lack of access to such equipment is a barrier to entry into the market.

ATC Leasing controls over 95% of the market for the transport of new class eight trucks in North America and over 50% of the market for the transport of new class six and seven trucks. Based on 2006 industry figures, ATC also controls at least 79% of the overall market for the transport of new class six, seven, and eight trucks in North America. These market shares probably explain why ATC Leasing is the primary purchaser of White Mule's truck transportation products.

---

[2]

Class six trucks weigh 19,501-26,000 pounds; class seven trucks weigh 26,001-33,000 pounds; and class eight trucks weigh 33,001 pounds or more.

[3]

"Connecting equipment" generally refers to the equipment used to connect a truck for transportation, including decking booms, saddles, and breaking units.

3

The connecting devices that White Mule sells to ATC are original designs that White Mule created. While ATC has, on several occasions, attempted to find a supplier other than White Mule to provide connecting equipment, it has been unable to do so because no other company can replicate the quality and price of White Mule's connecting equipment. As a result, White Mule is ATC's only source for connecting equipment.

In light of these statistics, White Mule claims that ATC Leasing has illegally monopolized, or attempted to monopolize, Relevant Market One and illegally monopsonized and monopolized, or attempted to monopsonize and monopolize, Relevant Market Two.[4] Plaintiffs allege that defendants tried to prevent new entrants into the truck delivery business by denying potential competitors access to the necessary equipment. As part of this anticompetitive scheme, according to plaintiffs, ATC Leasing filed patent applications falsely taking credit for White Mule's inventions, ultimately obtaining patents covering White Mule's connecting devices. The allegedly fraudulent patents include: 6,109,642 (the '642 patent); 5,722,677 (the '677 patent); and 6,120,051 (the '051 patent).[5]

White Mule also alleges that, over the years, ATC used its fraudulently obtained patents to drive competitors from the market for delivery of new class six, seven, and eight trucks. Specifically,

---

[4]

Monopsony, also known as a buyer's monopoly, is a form of monopoly power in which the monopolist is a buyer who controls the price, volume, and/or can make other anticompetitive demands on a seller. *See generally* Roger D. Blair & Jeffrey L. Harrison [hereinafter Blair & Harrison], *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297 (1991).

[5]

The '642, '677, and '051 patents – the "patents-in-suit" – all relate to designs for connecting equipment (the '642 patent incorporating saddle designs and the '677 and '051 patent relating to decking booms). The fourth relevant patent – number 5,465,813 (the '813 patent) – also relates to a connecting device (a brake unit device) but it was not included in the White Mule's original and first amended complaint and only appears in the plaintiffs' second amended complaint.

4

the patents allowed ATC to control the market for the supply of connecting devices [Market Two]. This control of market two allowed ATC to monopolize (and/or attempt to monopolize) the market for delivery of new class six, seven, and eight trucks [Market One].

As a part of this scheme, ATC eventually tried to prevent White Mule from selling connecting devices to other truck delivery companies. In late 2006, a potential competitor of ATC, hoping to enter the truck delivery market, placed an order with White Mule for connecting devices. This provoked a cease and desist letter from ATC to White Mule. ATC asserted that White Mule was infringing defendants' connecting device patents and demanded that White Mule cease any such infringement.

In conjunction with its cease and desist letter, ATC Leasing pressured White Mule to agree to an exclusive contract whereby White Mule would sell all its connecting devices to ATC and not sell any such devices to ATC's competitors. The contract also required White Mule to acknowledge that ATC had rightful ownership of the connecting device patents. Defendants assured White Mule that, if White Mule entered into the exclusive contract, the cease and desist letter would no longer be a problem. ATC concurrently told White Mule that, if White Mule refused to agree to the exclusive contract, ATC would start a patent infringement suit against White Mule and stop purchasing equipment from White Mule.[6]

White Mule did not agree to the exclusivity arrangement. Instead, it filed this lawsuit. Defendants responded by: 1) asserting counterclaims for patent infringement regarding the '642

---

[6]

During this period the Ritcheys were also negotiating the sale of White Mule to a third party that had already exercised its option to buy the company. Due to ATC's threat, however, the buyer refrained from proceeding with the closing on the sale and eventually decided not to purchase White Mule. White Mule cites this outcome – in addition to the lack of sales to other companies in Relevant Market One and injury to White Mule's reputation – as a source of its damages.

5

patent; 2) seeking injunctive relief to prevent White Mule from selling connecting devices to any potential competitor of the defendants; 3) presenting false affidavits and evidence to this court; 4) making representations to customers in Relevant Market One to cause such customers to believe that defendants had valid patents on the connecting devices needed to compete in such market and that ATC would prevent White Mule from selling connecting devices to others; 5) refusing to take delivery on pending orders with White Mule; and 6) refusing to pay White Mule for goods White Mule had delivered to defendants.

White Mule alleges that ATC, via this post-suit conduct, sought to maintain control over the market for truck delivery equipment as a means of eliminating any existing or potential competition in the truck delivery market. White Mule points out, for example, that after ATC filed its counterclaims it notified White Mule's customers and certain potential customers that: ATC had received a temporary restraining order enjoining White Mule from selling and/or manufacturing its products; any final decision was years away; and ATC would ultimately prevail on the merits.

According to plaintiffs, these events have caused significant damage to White Mule, including: 1) loss of sales to third parties due to defendants' assertion of the fraudulently obtained patents-in-suit; 2) loss of all sales to defendants as a result of White Mule's refusal to capitulate to defendants' illegal demand that White Mule sell only to them and acknowledge the validity of the fraudulent patents; 3) injury to the reputation of White Mule and White Mule's products by suggesting to the market that White Mule's goods infringed valid patents; 4) loss of the sale of the White Mule Company in 2006 to a potential purchaser; and 5) significant attorney's fees and litigation costs in defending against, and ultimately establishing the invalidity of, ATC's fraudulently obtained patents-in-suit. White Mule claims that these damages are "inextricably

intertwined with the anticompetitive injury inflicted on both the market to supply the necessary equipment, as well as competition and potential competitors in the truck delivery market." [Doc. 45 at 6].

White Mule asserts the following claims against all defendants: 1) a demand for declaratory judgment regarding defendants' fraudulently obtained patents covering White Mule's connecting devices (Count One); 2) a *Walker Process* claim for monopolization of the market for the transportation of new trucks in North America [Relevant Market One] (Count Two); 3) a *Walker Process* claim for monopsony and attempted monopolization of the market for the design and manufacture of the connecting devices [Relevant Market Two] including use of the fraudulently obtained patents and attempts to use such patents to obtain an exclusive contract from White Mule (Count Three); 4) a monopsony claim regarding Relevant Market Two and a claim of attempted monopolization of Relevant Market One (Count Four); 5) a claim of leveraging monopsony in Relevant Market Two into monopoly power in Relevant Market One by controlling the supply of equipment needed to compete in Relevant Market One (Count Five); and 6) a claim of attempting to use and maintain monopsony power in Relevant Market Two to force White Mule to recognize the validity of fraudulent patents (Count Six).

White Mule also directs specific claims at ATC alone (as purchaser and/or supplier of connecting devices in the same market as White Mule). These include claims of attempted monopolization of Relevant Market Two via attempts to obtain an exclusive agreement between White Mule and ATC (Count Eight) and a related *Walker Process* claim (Count Seven).

Further, plaintiffs allege that the JHT Group: conspired with ATC to monopolize Relevant Market Two (Count Nine) and, acting through ATC, attempted to monopolize Relevant Market Two by attempting to obtain an exclusive agreement between White Mule and ATC (Count Ten).

Plaintiffs assert non-antitrust claims for: product disparagement under the common law, the Ohio Deceptive Trade Practices Act, and the Lanham Act (Counts Eleven through Thirteen); defamation (Count Fourteen); unfair competition (Count Fifteen); and breach of contract (Count Sixteen).

### Discussion

### A. Standard of Review

As with any motion to dismiss under Fed.R.Civ.P. 12(b)(6), I deem all factual allegations in the complaint to be true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,    U.S.   , 127 S. Ct. 2499, 2509 (2007). When ruling on a Rule 12(b)(6) motion, a court must also construe the complaint in a light most favorable to the nonmoving party. *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir.1998).

The Supreme Court recently clarified this standard in *Bell Atlantic Corp. v. Twombly*,    U.S.   , 127 S. Ct. 1955 (2007). In *Twombly*, the Court considered the standard for dismissing a complaint filed under § 1 of the Sherman Act, explaining that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at      , 127 S. Ct. at 1964-65 (citations omitted). Though the complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* at      , 127 S. Ct. at 1965 (internal citations omitted); *see also Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548

8

(6th Cir. 2007); *Nicsand, Inc. v. 3M Co.*, 507 F.3d 442, 460 (6th Cir. 2007) (Martin, J., dissenting) (explaining that *Twombly* simply distinguished "between a bare-bones complaint asserting only the elements of a claim and a complaint asserting not only legal *elements*, but also *facts* to support those elements"). *But cf. Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 541 (6th Cir. 2007) (noting uncertainty about *Twombly*'s "reach beyond the antitrust context" (citing *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir.2007))).

### B. Claims Brought by Individuals and the Living Trust

In addition to White Mule, plaintiff parties include L. Steven Ritchey and Deborah K. Ritchey, both as individuals and as trustees of the L. Steven Ritchey Living Trust and the Deborah K. Ritchey Living Trust.

For the Ritcheys, whether as individuals or trustees, to have standing they must show they have suffered an "injury in fact" having a "causal connection [to] the defendants' conduct" and that there is "a substantial likelihood that the injury will be redressed by a favorable decision." *Huish Detergents Inc. v. Warren County Ky.*, 214 F.3d 707, 710 (6th Cir.2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

The Sixth Circuit has long held that "an action to redress injuries to a corporation . . . cannot be maintained by a stockholder in his own name." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 602-03 (6th Cir. 1988) (quoting *Schaffer v. Universal Rundle Corp.*, 397 F.2d 893, 896 (5th Cir.1968)). As a result, the defendants rightfully point out that this lawsuit cannot redress any injury to the trusts or the trustees. *See id.* at 603 ("[I]t is universal that where the business or property [is] allegedly interfered with by forbidden practices . . . it is that corporation alone, and not its stockholders (few or many) . . . who has a right to recovery."

9

(quoting *Schaffer*, *supra*, 397 F.2d at 896-97)) . I, therefore, dismiss the individual and trustee claims of L. Steven and Deborah K. Ritchey.

## C. Declaratory Judgment Regarding Patents

As a result of ATC's enforcement action and continued threats, White Mule seeks a judgment declaring the patents-in-suit and the '813 patent to be invalid and unenforceable under 35 U.S.C. §§ 101, 102, 111, 115, and 116 and 37 C.F.R. 1.56. The defendants move to dismiss these claims as they relate to the '677, '642, and '051 patents because, on November 6, 2007, ATC completely disclaimed these patents, which "made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 712 (6th Cir. 2007) (quoting *U.S. v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)).[7]

I agree that ATC's formal disclaiming of the '677, '642, and '051 patents forever and conclusively removes any possibility that ATC could assert the previously threatened infringement claims. *Guinn v. Kopf*, 96 F.3d 1419, 1422 (Fed. Cir. 1996) (disclaiming a patent "has the effect of canceling the claims from the patent and the patent is viewed as though the disclaimed claims had never existed in the patent"). This leaves me with no "actual controversy" to adjudicate with regard to the validity of the patents alone. *See Honig v. Doe*, 484 U.S. 305, 317 (1988); *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997).

---

[7]

Despite the fact that all four patents are in the second amended complaint, defendants have only disclaimed the initial three patents identified as the "patents-in-suit." Therefore, regardless of my decision regarding my jurisdiction over the disclaimed patents, the '813 patent remains in controversy.

10

Plaintiffs argue that, because a judgment on the patents is essential to White Mule's *Walker Process* claims, the patents' validity remains an issue in controversy. While a disclaimer of a patent would typically render this action moot, White Mule asserts that dismissal would be improper given the nature of its antitrust claims. In other words, White Mule should not "be expected to give up the predicate of invalidity when it is so crucial to its own claims." *Nat'l Semiconductor Corp. v. Linear Tech. Corp.*, 703 F. Supp. 845, 851 (N.D. Cal. 1988).

I am not certain, however, that a declaratory judgment is so crucial to the plaintiffs' ultimate right to full recovery (if they prevail) as to allow for an exception to the "actual controversy" requirement. While it is true that a judgment declaring the patents invalid would bolster the plaintiffs' *Walker Process* antitrust claims, it is not essential; "[i]nsofar as invalidity, unenforceability (*i.e.*, inequitable conduct) or non-infringement are 'elements' of a cause of action," I will "certainly receive and consider evidence" as to these issues. *Ericsson, Inc. v. Harris Corp.*, 2001 WL 257838 at *10 (N.D. Tex.); *see also Techimark, Inc. v. Crellin*, *Inc.*, 14 F. Supp. 2d 762, 763-64 (M.D. N.C. 1998) (distinguishing *Nat'l Semiconductor Corp.*, *supra*).

For the same reason, I agree with other district courts holding that "a judgment of invalidity of patent is not legally significant with respect to a pending request for attorney fees under §285" *Techimark, Inc.*, *supra*, 14 F. Supp. 2d at 766. While potentially helpful to proving plaintiffs' rights to attorney's fees, lack of such a judgment does not deprive me of jurisdiction to award fees. *Samsung Elecs. Co., Ltd. v. Rambus, Inc.*, 398 F. Supp.2d 470, 482-83 (E.D. Va. 2005) (intervening mootness does not divest a court of jurisdiction over plaintiffs' attorney's fees claims).

Accordingly, I dismiss the plaintiffs' request for a declaratory judgment on the patents-in-suit.

11

### D. Antitrust Claims

White Mule's antitrust claims break down into three forms of anticompetitive conduct: 1) monopolization, attempted monopolization, and conspiracy to monopolize in Relevant Market One; 2) monopsony, attempted monopsony, and conspiracy to monopsonize in Relevant Market Two; and 3) monopolization, attempted monopolization, and conspiracy to monopolize in Relevant Market Two.

Plaintiffs also assert *Walker Process* claims in relation to all their claims of anticompetitive conduct. As stated in *Kearney & Trecker Corp. v. Cincinnati Milacron Inc.*, 562 F.2d 365, 372-73 (6th Cir. 1977), the Supreme Court held in *Walker Process* that a party could "recovery in treble damages under Section 4 of the Clayton Act" if it could "show injury to its business or property resulting from the fraudulent procurement of a patent coupled with violation of Section 2 of the Sherman Act." White Mule alleges that ATC used its patent infringement claims to maintain its monopsony in Relevant Market Two and achieve or maintain monopolies in Relevant Markets One and Two.

Defendants move to dismiss plaintiffs' antitrust claims, arguing that: 1) White Mule lacks standing; 2) the relevant market definitions do not support the related claims; 3) the allegations do not support the related claims; and 4) the defendants, as part of a single economic entity, cannot conspire with one another. Further, ATC requests that I dismiss claims against JHT, Active, ACS, and Unimark because the complaint does not attribute any specific conduct to these entities. I deal with ATC's last two requests (the motions related to the conspiracy claims and claims against JHT, Active, ACS, and Unimark) first and then analyze the remaining arguments as they apply to each of the three forms of monopolization.

12

### 1. Conspiracy

White Mule's pleadings concede that the Supreme Court's decision in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775-77 (1984), stands for the proposition "that a parent and wholly owned subsidiary cannot conspire with each other under § 1." [Doc. 45 at 37]. This interpretation of *Copperweld* is correct. *Copperweld*, *supra*, 467 U.S. at 776 ("[T]he coordinated behavior of a parent and its wholly owned subsidiary falls outside the reach of [§1]"); *Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*, 772 F.2d 214, 216 (6th Cir. 1985) (explaining Sherman Act § 1 "applies only to action by at least two separate entities"). Therefore, because ATC is a wholly owned subsidiary of JHT, I dismiss Count Nine of the plaintiffs' second amended complaint and dismiss Counts Two though Eight and Count Ten to the extent that they allege the defendants conspired amongst themselves to violate antitrust laws.

### 2. Claims Against JHT, Active, ACS, and Unimark

Defendants also move to dismiss claims against JHT, Active, ACS, and Unimark for want of allegations of specific anticompetitive conduct by these defendants. This contention is not entirely accurate.

With regard to JHT, White Mule's claim that the parent corporation took actions on its own and through its subsidiary meets the pleading requirements outlined in *Twombly*, *supra*,     U.S. at     , 127 S. Ct. at 1964-65 ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (internal citations omitted)). In the case of ACS, the subsidiary corporation's actions in bringing a counterclaim against White Mule for infringing the '642 patent relates directly to several

of the plaintiffs' monopolization claims. These claims identify and explain ACS's allegedly anticompetitive actions.

With regard to White Mule's claims against Active and Unimark, however, defendants have a stronger argument for dismissal. In the second amended complaint, White Mule only mentions these two subsidiaries to explain that they are wholly owned and controlled affiliates of JHT. The plaintiffs attribute no conduct, illegal or otherwise, to these parties. As a result, I dismiss the complaint as against Active and Unimark.

### 3. ATC's Arguments for Dismissal of Monopoly and Monopsony Claims

ATC alleges that White Mule lacks standing, has not sufficiently supported its claims of monopoly power or abuse of monopsony power, and has not adequately pled that the markets identified are the proper markets for this antitrust analysis. These arguments compel me to explain my interpretation of these legal issues generally, before moving on to their specific applications to the alleged antitrust violations.

### a. Standing

White Mule's monopoly claims allege that, through approximately a dozen different actions, ATC violated § 2 of the Sherman Act. 15 U.S.C. § 2. Section two of the Sherman Act states that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony." Though on its face this section has only criminal consequences, § 4 of the Clayton Act, 15 U.S.C. § 15, provides treble damages relief to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."

14

Despite this encouragement to private plaintiffs, there are some hurdles to bringing a civil antitrust suit. In contrast to a general claim for damages, "to have standing to prosecute private antitrust claims, plaintiffs must show more than that the defendants' conduct caused them injury." *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994). The plaintiff must show that it suffered an *antitrust* injury or an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[8] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Am. Ad Mngmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (requiring "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from the which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent").

Yet even this showing may not be enough to confer standing definitively, as "a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 [of the Clayton Act] for other reasons." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986). In *Associated Gen. Contractors of Cal. [AGC] v. Cal. Council of Carpenters*, 459 U.S. 519, 529 (1983), the Supreme Court recognized that a "literal reading of the [the Clayton Act] statute is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." The Court, however, concluded that Congress could not have intended "such an open-ended meaning" as it was "primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices by the giant trusts and combinations that dominated certain interstate markets." *Id.* at 530. Analyzing the Congressional history, the statute's

---

8

Courts often point out that this requirement ensures the oft-stated adage that antitrust laws are for the protection of "competition, not competitors." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 320 (1962).

language, and common law interpretations thereof, the Court concluded that lawmakers "did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Id.* at 534 (quoting *Haw. v. Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972)). In addition to showing an antitrust injury, the Court laid out "[a] number of other factors that may be controlling." *Id.* at 538.

Over time these instruction have led courts to develop "a two-pronged analysis to determine whether a plaintiff has antitrust standing." *Balaklaw*, *supra*, 14 F.3d at 798 n.9. First a court must determine whether the plaintiff suffered an antitrust injury. If so, a court must then "determine whether any of the other factors, largely relating to the directness and identifiability of the plaintiff's injury, prevent the plaintiff from being an efficient enforcer of the antitrust laws." *Id.*; *see also AGC*, *supra*, 459 U.S. at 537-45 (explaining the "other factors").

The Sixth Circuit requires consideration of five factors in an analysis of the second prong:

(1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000) (quoting *Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983)).[9] In *Indeck*

---

[9] Other circuits interpret *AGC* to require courts to consider slightly different factors. For example, the Fourth Circuit examines:

(1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended, (2) whether the harm "was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws," (3) the directness of the alleged injury, (4) "the existence of more

*Energy*, the court also instructed that, "[a]ll five factors must be balanced  .  .  .  with no one factor being determinative." *Id*.

Therefore, if necessary, I will apply these factors to each of the three forms of antitrust conduct asserted by plaintiffs to determine whether White Mule can prosecute its claims under § 4 of the Clayton Act.

### b. Monopoly Power

The Sixth Circuit defines monopoly power as a market participant's ability "to raise prices or to exclude competition when it is desired to do so." *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 935 (6th Cir. 2005) (quoting *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 850 (6th Cir. 1979)); *see also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 464 (1992) (defining monopoly power as "the ability of a single seller to raise price and restrict output" (quoting *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969))). This power can generally be "inferred from the seller's possession of a predominant share of the market." *Eastman Kodak*, *supra*, 504 U.S. at 464. While "it is doubtful whether sixty or sixty-four percent would be

---

direct victims" of the alleged antitrust injury; and (5) "problems of identifying
damages and apportioning them" among those directly and indirectly harmed.

*Kloth v. Microsoft*, 444 F.3d 312, 324 (4th Cir. 2006) (internal citations omitted); *see also Novell*,
*supra*, 505 F. 3d at 311; *Paycom Billing Servs., Inc. v. Mastercard Int'l Inc.*, 467 F.3d 283, 290-91
(2d Cir. 2006); *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999).

Recently, the Sixth Circuit quoted the factors listed in *AGC*, namely: 1) the nature of the claimant's
injury; 2) the character of the relationship between the alleged antitrust violation and the claimant's
injury; 3) the potential for duplicative recovery or complex apportionment of damages; and 4) the
existence of more direct victims. *Nicsand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007)
(quoting *AGC*, *supra*, 459 U.S. at 545). While nominally different from previous lists, these factors
focus on the same issues as the five factors first presented in *Southaven Land Co., Inc. v. Malone
& Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983).

17

[a large] enough [share of the market]; and certainly thirty-three per cent is not," I agree with the parties that control of seventy percent of a relevant market is a reasonable threshold for assessing allegations of monopoly power. *U.S. V. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945). While such market share is by no means dispositive on the merits of the case, it suffices to overcome a motion to dismiss alleging lack of monopoly power. *Cf. Byars*, *supra*, 609 F.2d at 850-51 ("Although courts have been quick to find monopoly power where the market share is 75-80% or greater, this should be regarded as a starting point.").

### c. Market Definition

Though I analyze each market individually, I note at the outset that "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 n.3 (6th Cir. 2005) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)).

"Relevant market," is a vague term. The Sixth Circuit has explained that it "encompasses notions of geography as well as product use, quality, and description." *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719 (6th Cir. 2003) (quoting *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001)). Years ago, the Supreme Court noted that "[t]he boundaries of  .  .  .  a [product] submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the products' peculiar characteristics and uses, unique product facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962) (*quoted in Spirit Airlines, Inc.*, *supra*, 431 F.3d at 933).

18

I will consider all these factors. If, however, plaintiffs plead facts suggesting a relevant market encompassing all "products or services that are reasonably interchangeable," I am inclined to withhold any definitive judgment on the parameters of that market until the conclusion of discovery. *Nat'l Hockey*, *supra*, 419 F.3d at 471; *see also Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery."); *Todd*, *supra*, 275 F.3d at 203 (at the 12(b)(6) stage "it is sufficient that plaintiff has alleged specific facts that support a narrow product market in a way that is plausible and bears a rational relation to the methodology courts prescribe to define a market for antitrust purposes.").

### 4. White Mule's Monopoly and Monopsony Claims

In *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966), the Supreme Court explained that a § 2 illegal monopolization has two distinct elements: 1) possession of monopoly power in the relevant market and 2) "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* (*quoted in Byars, Inc.*, *supra*, 609 F.2d at 849). The same elements logically apply to illegal monopsonization. *See* Susan Foster, *Monopsony and Backward Integration: Section 2 Violations in the Buyer's Market*, 11 U. Puget Sound L. Rev. 687, 717 (1988).

### a. Monopolization Claims in Relevant Market One

With regard to Relevant Market One, White Mule asserts a *Walker Process* claim for monopolization (Count Two) and a claim that ATC leveraged its monopsony in Relevant Market Two to maintain a monopoly in Relevant Market One (Counts Four and Five).

White Mule's *Walker Process* claim alleges that ATC threatened enforcement of the fraudulently obtained patents-in-suit to prevent White Mule from selling equipment – namely, the connecting products sold in Relevant Market Two – to ATC's competitors to prevent those entities from competing in Relevant Market One. While this claim asserts that the defendants' fraudulently obtained the patents in question and that the patents provided exclusionary power, it does not assert that this exclusionary power manifested itself in the proper market. *See Walker Process*, *supra*, 382 U.S. at 177.

White Mule's allegations describe a *Walker Process* claim in the supplier's market (Relevant Market Two) to which the patents applied, not the buyer's market (Relevant Market One). For a *Walker Process* claim to apply to Relevant Market One, ATC would have had to have threatened patent enforcement against its competitors or its competitors' customers. *See, e.g.*, *Kearney & Trecker Corp.*, *supra*, 562 F.2d 365, 372-74 (upholding damages for *Walker Process* counterclaims against competitor who threatened to enforce a fraudulent patent in an effort to monopolize the market in which the patent applied); *Molecular Diagnostic Labs. v. Hoffmann-La Roche Inc.*, 402 F. Supp. 2d 276, 281-82 (D. D.C. 2005) (providing product consumer with standing to bring *Walker Process* claim against defendant who enforced patent against competitors to monopolize the market in which the defendant sold patented product).

This distinction becomes even more clear on looking at White Mule's injuries. An examination of the factors outlined in *Southaven* reveal that White Mule is not the appropriate plaintiff to serve as the enforcer of antitrust laws related to this violation in Relevant Market One. To begin with, none of White Mule's injuries directly relate to attempted monopolization of this market. *Southaven Land Co., Inc.*, *supra*, 715 F.2d at 1085. Only White Mule's first claim – loss of

sales to third parties due to ATC's assertion of the fraudulently obtained patents-in-suit – could indirectly connect to this monopolization claim. However, I interpret that injury to refer to the *immediate* loss of sales to third parties caused by the patent counterclaims – not the latter effect of this monopolization effort diminishing competitors in Relevant Market One.[10]

Even if related to this alleged antitrust violation, such damages would be speculative at best. *Id.* There are also more direct victims of the alleged scheme: namely, the very third parties which plaintiffs identify. *Id.; see also Grip-Pak, Inc. v. Ill. Tool Works, Inc.*, 694 F.2d 466, 474 (7th Cir. 1982) (distinguishing, for standing purposes, between parties that are the target of an anticompetitive scheme and innocent bystanders). In sum, though White Mule may have valid claims related to ATC's patent enforcement action, a *Walker Process* claim for monopolization of Relevant Market One is not one of them.

The same injury analysis applies to any relationship between White Mule's injuries and ATC's efforts to leverage its monopsony in Relevant Market Two to obtain a monopoly in Relevant Market One. White Mule's injuries – which are not closely related to monopolization of relevant one for the purposes of a *Walker Process* claim – are equally indirect and speculative in relation to a general monopolization claim for the same market.

**b. Monopsony Claims in Relevant Market Two**

---

[10]

I recognize that White Mule argues that those third party customers not receiving White Mule's products leads to the same outcome for ATC: fewer competitors. But that does not mean that White Mule suffered a direct antitrust injury from ATC's monopolization of Relevant Market One. Only that it lost those customers due to the patent suit.

With regard to monopsony claims in Relevant Market Two, White Mule asserts a *Walker Process* claim for monopsony (Count Three); a general claim for monopsony maintenance (count four); and a claim for maintenance of monopsony power (Count Six).

ATC argues that "as a supplier rather than a competitor or customer, White Mule's purported injuries are not of the type designed to be protected by antitrust laws." [Doc. 44 at 10]. This contention – questionable even in the monopoly context, *cf. Telecor Commc'ns, Inc. v. Southwestern Bell Tel. Co.*, 305 F.3d 1124, 1133 (10th Cir. 2002) – certainly cannot apply to monopsony claims. *See* Phillip E. Areeda & Herbert Hovenkamp, et. al., Antitrust Law ¶ 350b (2007) ("Notwithstanding numerous statements to the effect that the primary or even exclusive concern of antitrust is 'consumer' welfare, upstream, or monopsony, injury to suppliers is treated in largely the same way as injury to consumers.").

In contrast to a monopoly, in a monopsony the buyer uses its market power to damage competition among upstream market participants. In such a situation, the direct victims are competitors and suppliers rather than competitors and customers. *See Id.*; *Telecor Commc'ns, Inc.*, *supra*, 305 F.3d at 1133-34 (pointing to precedents indicating that suppliers "are protected by antitrust law even when the anti-competitive activity does not harm end-users").[11]

White Mule alleges that ATC possesses monopsony power in Relevant Market Two because it is the primary buyer in that market. Plaintiffs support this argument by pointing out that because defendants have a monopoly in Relevant Market One (the truck delivery market), and Relevant

---

[11] Most commentators agree, however, that monopsony still effects consumers because "there is a dead-weight loss associated with imposition of monopsony pricing restraints. Some producers will either produce less or cease production altogether, resulting in less-than-optimal output of the product or service, and over the long run higher consumer prices, reduced product quality, or substitution of less efficient alternative products." *Telecor Commc'ns, Inc.*, 305 F.3d at 1136.

Market One "defines the buyers for the connecting devices offered in Relevant Market #2," defendants must possess a monopsony in Relevant Market Two.[12] [Doc. 45 at 20]. White Mule also concedes that it possesses a legally obtained monopoly in Relevant Market Two and that its loss of ATC as a customer would lead to its collapse. If this is the case, then ATC is certainly a dominant, it not controlling, purchaser in Relevant Market Two.

A larger problem, however, hinders the plaintiffs' monopsony claims. Possession of monopsony power, like possession of monopoly power, is not an antitrust violation in and of itself. *See* Blair & Harrison, *supra*, 76 Cornell L. Rev. at 307. The supplier bringing a monopsony claim must show that it was injured by the monopsonist's violation of antitrust laws. White Mule fails to make such a showing.

Commentators describe two general ways in which monopsonists can abuse their market position: 1) under-purchasing inputs, leading to a decrease in demand and a reduction in the amount a monopsonist has to pay for the input, *Id.* at 297-98; or 2) over-purchasing inputs, which raises rivals costs or causes "buyer-side competitors to exit the market or permanently shrink their capacity." Steven C. Salop, *Anticompetitive Overbuying by Power Buyers*, 72 Antitrust L.J. 669, 669 (2005). In both cases, ultimately, the price the monopsonist pays for the input will go down (though

---

[12]

I note that monopsonist buyers who also have a monopoly in the output market pose the greatest threat to competition. This is because they have no incentive to pass lower prices on to consumers (even in the short term) and, if prices for inputs (temporarily) go up, such monopsonists can compensate for the increased input costs by increasing output prices. *See, e.g., Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.,*    U.S.   , 127 S. Ct. 1069, 1076 n.2 (2007); *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1232 n.10 ("The danger of increased consumer prices is especially acute when the monopsonist resells in a monopolized market"); *see also* Blair & Harrison, *supra*, 76 Cornell L. Rev. at 300, 303-04, 306 (1991) ("[T]here is no correlation between an initial decrease in prices and any overall long-run benefits to consumers.").

in the latter case the monopsonist must first drive buyer-side competitors out of the market). *See Wyerhaeuser v. Ross-Simmons Hardwood Lumber Co.*,   U.S.    , 127 S. Ct. 1069, 1075-78 (2007).

This does not mean that the Sherman Act only bars a monopsonist from illegally affecting prices: "[j]ust as in monopoly cases, there are instances in which the 'abuse' of power is not designed to lower prices but to exact some other form of advantage for the monopsonist."[13] Blair & Harrison, *supra*, 76 Cornell L. Rev. at 320. Like the present case, non-price cases usually involve some form of coerced exclusivity, in which the monopsonist "persuades" its suppliers not to provide inputs to a competitor. *U.S. v. Griffith*, 334 U.S. 100 (1948) (exclusivity arrangement); *Klor's v. Broadway Hale Stores*, 359 U.S. 207 (1959) (monopsonist arranged supplier boycott against its competitor).

But, in contrast to the present case, plaintiffs in non-price monopsony cases are usually the monopsonist's competitors who have lost access to their suppliers. This is because when price is not the factor that monopsonist's aim to control, the monopsonist's competitors – rather than the monopsonist's suppliers – generally suffer the antitrust injury. *Compare Griffith*, *supra*, 334 U.S. 100 (plaintiffs sue competitors for imposing an exclusivity arrangement on suppliers) *and Klor's*, *supra*, 359 U.S. 207 (same), *with Todd*, *supra*, 275 F.3d at 202-03 (employees have standing when employers' monopsony power over relevant labor market reduces wages); *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1301-03 (9th Cir. 1983) (logging company supplier has

---

[13]

This also does not mean that all monopsonistic buyers violate antitrust law by bargaining for uncompetitive prices. Antitrust laws only prevent market actors from setting uncompetitive prices below incremental costs (i.e. "predatory" prices). *Kartell v. Blue Shield of Mass.*, 749 F.2d 922, 927 (1st Cir. 1984).

standing to sue mill when the mill unlawfully imposed a multi-year contract that lowered the sale price of logs).

White Mule's alleged monopsony injuries illustrate why plaintiffs in non-price monopsony cases are usually competitors. In its independent monopsony claims, White Mule alleges that ATC's request for an exclusive contract constituted an illegal effort to maintain a monopsony that injured White Mule through: 1) lost sales to defendants as a result of the plaintiffs' refusal to capitulate to defendants' illegal demand that White Mule sell only to ATC and 2) the loss of the proceeds that the individual plaintiffs and their trust expected to obtain from the sale of White Mule to a potential purchaser.

These are not antitrust injuries. Rather, these would be the results of any hard bargaining effort on ATC's part to get an exclusive contract from the predominant supplier of connecting devices. *See Axis S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1111 (6th Cir. 1989) (alleged antitrust violations did not lead to plaintiff's injuries); *see also Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 123 (2d Cir. 2007) (no standing because "particular injury was not caused by an exercise of the defendant's newly acquired power to raise prices"); *Balaklaw*, *supra*, 14 F.3d at 800 (no standing because exclusive dealing claim "alleged no threat of 'adverse economic consequences' to anyone but [plaintiff]").

This is not to say that an exclusivity arrangement could *never* lead to supplier antitrust injuries. For example, if ATC had been successful in using its monopsony position to coerce White Mule into agreeing to the exclusivity deal, the arrangement might have forced White Mule into repricing its product in what would have amounted to an "all or nothing" arrangement.[14] Blair &

---

[14]

An all or nothing supply case allows a monopsony buyer to purchase the maximum quantity a

25

Harrison, *supra*, 76 Cornell L. Rev. at 317. However, an all or nothing arrangement would be particularly difficult in the present situation because the supplier is an organized entity (rather than one of numerous competing suppliers) with its own monopoly in the supply market.[15] As one noteworthy article explains:

> The success of [an "all or nothing"] collusive effort hinges on the credibility of the threat to refuse to buy anything. With many sellers, such a threat may be perceived as credible because each seller knows that the buyer can turn to rival sellers. In contrast, if there were only one seller, the collusive threat to buy nothing at all would not be credible.

*Id.* at 317 n.112. It is highly likely that this factor influenced White Mule's decision to reject ATC's coercive proposal. In any case, White Mule never suffered the speculative antitrust injuries that could have resulted had it agreed to the exclusivity contract.

As with its Relevant Market One monopoly claims, White Mule attempts to bolster its monopsony claims by adding *Walker Process* allegations. These allegations are misplaced in the monopsonization context because patents create legal monopolies, not monopsonies. *Walker Process Equip., Inc.*, *supra*, 382 U.S. at 177 (identifying a patent as "an exception to the general rule against monopolies" and noting that the public has "a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud" (quoting *Precision Instruments Mfg. Co. v. Auto. Maint.*

---

supplier will make available at a particular price when the supplier's alternative is to sell nothing. Blair & Harrison, *supra*, 76 Cornell L. Rev. at 317. In such a situation, colluding buyers – or a buyer with an exclusivity agreement – could obtain a privately optimal quantity at the supplier's lowest price point. This is to the buyer's benefit because, in contrast to the classic monopsony model in which the monopsonist must reduce the quantity purchased to lower prices, a monopsonist "would prefer to pay the lower price without reducing the quantity purchased." *Id.* at 316.

[15] Plaintiffs also concede that "Defendants are not alleged to have entered into an exclusive agreement to get a better price, rather Defendants attempted to prevent White Mule from selling its products to anyone else." [Doc. 45 at 16].

*Mach.*, 324 U.S. 806, 816 (1945))). Efforts to enforce fraudulent patents simply do not correlate with monopsony violations of Sherman Act § 2.[16]

### c. Monopolization and *Walker Process* Claims in Relevant Market Two

With regard to monopoly claims in Relevant Market Two, White Mule asserts claims for attempted monopolization (Counts Eight and Ten), *Walker Process* claims for attempted monopolization (Counts Three, Seven, Eight, and Ten), and a claim that ATC leveraged its monopsony power to obtain a monopoly (Count Six).

White Mule makes contradictory statements regarding defendants' involvement in Relevant Market Two. On the one hand plaintiffs explain that "JHT owns and controls ATC and other affiliated companies" and that "ATC leases, rents, sells or otherwise transfers While [sic] Mule's saddles, decking booms, and other connection devices to the affiliated companies in the JHT Group." [Doc. 38 at ¶¶ 7, 11]. On the other, it alleges that "ATC is a buyer and supplier of saddles, decking booms, and other connection devices and in such capacity competes with White Mule to supply such products to end users." [*Id.* at ¶ 11].

White Mule defines Relevant Market Two as "the market for the design and manufacture of saddles, decking booms, and other connection devices utilized in the market for the delivery of new trucks in North America." [*Id.* at ¶ 99]. ATC's transactions with JHT subsidiaries do not involve designing or manufacturing connecting devices and so do not occur in the same market as White Mule's sales to ATC. *Cf. U.S. v. Blue Bell, Inc.*, 395 F. Supp. 538, 543 (M.D. Tenn. 1975) (sales by garment manufacturers to "their own affiliated laundries are not within the market in respect to

---

[16]

Notably, the patent infringement claims in this case, if successful, could have provided ATC with a monopoly, rather than a monopsony, in Relevant Market *Two*. See section D.4.c.

which the competitive effects of this acquisition should be judged"). With regard to these sales, therefore, ATC and White Mule are not competitors.

This conclusion undermines the factual premise, in Counts Eight and Ten, that "ATC is both a purchaser and supplier of product in Relevant Market #2." [Doc. 38 at ¶ ¶ 99, 145, 157]. As a result, ATC has not alleged facts sufficient to demonstrate portions of Counts Eight and Ten and – to the extent that they claim that ATC attempted to monopolize Relevant Market Two by coercing White Mule to sell products exclusively to ATC – I dismiss both of these claims. *See Twombly*, *supra*,     U.S. at     , 127 S. Ct. at 1966.

This does not, however, mean that ATC could not take other action that would constitute an illegal effort to monopolize "the market for the design and manufacture of saddles, decking booms, and other connection devices." [Doc. 38 at ¶ 99]. An effective, though possibly illegal, means of achieving this end would be to assert ownership of various patents in an effort to control the manufacture of connection devices. This is exactly what White Mule alleges ATC did when it threatened enforcement of the fraudulently obtained patents.

Given the allegations regarding relevant markets and market power, ATC's threatened enforcement of the patents are near textbook *Walker Process* violations. *See* 382 U.S. at 174 ("enforcement of a patent procured by fraud  .  .  .  may be violative of s 2 of the Sherman Act provided the other elements necessary to a s 2 case are present."). The only distinction would be that, rather than using its fraudulently obtained patents to exclude a competitor directly, ATC would be using the patents to exclude or control the manufacturer of the products in Relevant Market Two.

In contrast to its other claims, White Mule's injuries – loss of sales to third parties due to defendants' assertion of rights under fraudulently obtained patents; significant attorney's fees and

28

litigation costs in defending against ATC's patent infringement suit – flow directly from the alleged *Walker Process* antitrust violation. *Id.*; *Brunswick Corp.*, *supra*, 429 U.S. at 489 (explaining that antitrust standing requires that the injury must be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful").

Applying the second prong of the standing analysis it is also apparent that: there is a strong causal connection between violation and harm (particularly with regard to White Mule's costs in defending the patent suit); the injury was direct; damages are not speculative; and there is no potential for duplicative recovery or complex damages. Plaintiff is also a competitor in the relevant market and is arguably the most direct victim of the defendants' efforts to use a fraudulently obtained patent to secure a monopoly in Relevant Market Two. *Indeck Energy Services, Inc.*, *supra*, 250 F.3d at 976 (quoting *Southaven Land Co., Inc.*, *supra*, 715 F.2d at 1085).

These last two *Southaven* factors, however, inspire numerous other questions. Arguably, because ATC is White Mule's customer, a more appropriate plaintiff would be ATC's competitors cut off from a supplier. *Cf. Molecular Diagnostic Lab*, *supra*, 402 F. Supp. 2d at 280-82 (customer suffering supra-competitive prices can bring antitrust claims). However, this is not a claim that ATC monopolized Relevant Market One, but rather that ATC tried to use its patents to monopolize Relevant Market Two. While defendants may not be competitors in the market for the design and manufacture of connecting devices, ATC can hardly assert ownership of patents over inventions essential to products in Relevant Market Two without conceding it is a market participant in some form. *Cf. id.* at 280 (plaintiff need not be an actual or potential competitor of defendant to suffer antitrust injuries and bring a *Walker Process* claim); *Grip-Pak, Inc.*, *supra*, 694 F.2d at 473-74 (if

29

a target of defendant's anticompetitive scheme, plaintiff need not be a competitor in defendant's market to recover damages).

Furthermore, with regard to *Walker Process* claims, the best plaintiff may be the one threatened with, or targeted by, an infringement suit. *Cf. Molecular Diagnostic Lab*, *supra*, 402 F. Supp. 2d at 279 n.4 (noting that "the vast majority of *Walker Process* claims are brought by parties against whom the patent is enforced"). Balancing the factors in *Southaven*, I am convinced that White Mule has antitrust standing to bring a *Walker Process* claim for attempted monopolization of Relevant Market Two. *Indeck Energy Services, Inc.*, *supra*, 250 F.3d at 976 ("All five factors must be balanced.").

Because White Mule has cleared the standing hurdle I must now assess ATC's other arguments in favor of dismissal.

ATC defends against the instant monopolization claim by arguing that facts in the complaint contradict White Mule's assertion that there are no adequate substitutes for the patented devices. This issue reveals the overlap in the market definition and market power analyses. How a court defines the relevant market may dictate whether that court finds a defendant has monopoly power.

White Mule's pleadings explain that: 1) the patents' technology is incorporated into virtually all of White Mule's products and 2) power over these products constitutes a monopoly in Relevant Market Two because competitors have not been able to produce connection devices of the same technological and economic efficiency as those produced by White Mule. ATC's efforts to find replacement providers of connection devices – and its inability to do so – bolster the plaintiffs' claim that there are no other reasonably interchangeable products. *See Spirit Airlines, Inc.*, *supra*, 431 F.3d at 933.

30

Thus, at this stage of the litigation, I accept White Mule's contention that the relevant market for products necessary to compete in the truck delivery market is identical to the products covered by the defendants' fraudulently obtained patents.[17] *Cf. Nat'l Hockey League Players Assoc.*, *supra*, 419 F.3d at 472 n.3 (noting that market definition is fact intensive and courts hesitate to grant motions to dismiss for failure to plead a relevant market).

ATC also argues that White Mule fails to allege that ATC had an intent to destroy competition and a likelihood of success in doing so. *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir.2002) (holding that, in addition to proving the elements of monopolization, for an attempt claim a "plaintiff must prove a specific intent to 'destroy competition or build a monopoly'" to overcome summary judgment (quoting *Tops Mkts., Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 101 (2d Cir.1998))). I note, however, that at this stage of the litigation, "a factfinder could also reasonably infer a specific intent to destroy competition from the . . . defendants' conduct." *Tops Mkts.,Inc.*, *supra*, 142 F.3d at 101. This is because "'no monopolist monopolizes unconscious of what he is doing.' Thus, '[i]mproper exclusion (exclusion not the result of superior efficiency) is always deliberately intended.'" *Conwood*, *supra*, 290 F.3d at 782 (internal citations omitted) (*quoted in Spirit Airlines, Inc.*, *supra*, 431 F.3d at 932).

ATC's likelihood of success theory stretches the law of attempt even further. According to the defendants, failure of the alleged monopoly scheme proves there was never any "dangerous probability" of its success. Such a conclusion would undermine most attempt claims. Furthermore, in this case, the plaintiffs' decision to reject to the defendants' exclusivity plan cannot undermine

---

[17] White Mule's admissions that the technology was known and used by others does not contradict this statement, nor does the existence of other potential customers.

its claim if only because the very actions that constitute the *Walker Process* violation – the patent infringement suit – occurred *after* White Mule rejected the plan. *See Tops Mkts., Inc.*, *supra*, 142 F.3d at 100 ("That [plaintiff] failed to demonstrate the monopoly power required to prove the offense of completed monopolization therefore does not, *a fortiori*, lead to the conclusion that it failed to make a sufficient showing with respect to its attempted monopolization cause of action."); *Hart-Carter Co. v. J.P Burroughs & Sons, Inc.*, 654 F. Supp. 23, 24-25 (E.D. Mich. 1986) (dangerous probability of success test "requires an appraisal of the alleged offender's ability to achieve the forbidden result, his intent, and the nature of his overt actions." (quoting *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 598 (7th Cir. 1971))).

For these reasons, I deny defendants' motion to dismiss plaintiffs' *Walker Process* claim for the attempted monopolization of Relevant Market Two.

### E. State Law and Lanham Act Claims

White Mule alleges two sets of statements made by defendants to third parties disparaged White Mule's products, defamed White Mule, constituted unfair competition, and violated both the Ohio Deceptive Trade Practices Act, O.R.C. § 4165.01 *et seq.*, and the Lanham Act, 15 U.S.C. § 1051 *et seq.* Plaintiffs also claim that ATC breached contractual obligations to White Mule. Defendants move to dismiss these claims.

Defendants' representatives made the first set of statements [statement set one] to Steve Ritchey and a prospective purchaser of White Mule on December 20, 2006, shortly after White Mule entered into a contract to sell connecting devices to a potential competitor of ATC. At this time, ATC presented Ritchey and the potential purchaser of White Mule with a cease and desist demand letter stating that White Mule may be infringing the '642, '677, and '051 patents. Representatives

32

of defendants then told Ritchey and the potential purchaser that they would sue White Mule for patent infringement if White Mule did not agree to sell its connecting devices exclusively to ATC.

Plaintiffs allege that these statements were false and, further, caused the cancellation of the sale of White Mule: immediately after the meeting with ATC, the potential purchaser told Ritchey that he would not close on the deal as planned. Within a week of the meeting, the potential purchaser backed out of the multi-million dollar sale of White Mule.

The second set of disparaging statements [statement set two] occurred after ATC and ACS filed their initial pleadings in this case, which included a counterclaim against White Mule for infringement of the '642 Patent, and a motion for a temporary restraining order. In communications with truck manufacturers – one of which was also a prospective customer of White Mule – defendants represented that they: 1) would prevail in the pending lawsuit, and 2) had obtained a temporary restraining order against White Mule enjoining it from manufacturing or selling its product.

White Mule claims that these statements were damaging to White Mule because they led to a decrease in sales and damaged the company's reputation. With regard to their veracity, White Mule alleges that they were false statements of fact because they: indicated that ATC would prevail in the patent infringement claim when there was no possibility of that occurring because ATC fraudulently procured the '642 patent, and 2) expressly stated that I issued a "temporary restraining order."[18]

_____

[18] I never issued an order restraining White Mule from selling its products. To be sure, ATC sought a temporary restraining order on February 20, 2007, whereon I had a telephone conference with the parties. During the call, I undertook to ascertain whether I needed to consider the merits of defendants' motion for a temporary restraining order, or whether such consideration could be deferred pending a preliminary injunction hearing. After learning from defendants that they were

**1. Ohio Deceptive Trade Practices Act, Common**

**Law Product Disparagement, and Unfair Competition**

The Ohio Deceptive Trade Practices Act states that "[a] person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person  .  .  . (10) Disparages the goods, services, or business of another by false representation of fact." O.R.C. § 4165.02(A).

---

particularly concerned about the shipment of 3,000 saddles to a potential competitor, I asked White Mule's counsel when White Mule planned to deliver the 3,000 saddles. White Mule's counsel responded that delivery had not yet been requested, and that no request for delivery was anticipated in the next several weeks. I then asked White Mule's counsel whether White Mule would agree to notify both the Court and defense counsel when it received the request to deliver the 3,000 saddles. White Mule's counsel consented to the same, and I set the matter for a preliminary injunction hearing in April, 2007

On February 22, 2007, I issued an order memorializing the agreement. It stated that White Mule would not:

> deliver, transfer title, or otherwise alter the present status of the 3000 units that are the subject of the defendants' counter-claim without giving notice promptly to counsel and the court after it has received instruction to deliver said units to plaintiff's customer, and the court has thereafter conducted further proceedings re. defendants' motion for temporary restraining order/preliminary injunction.

[Doc. 17 at 1].

This was not a "temporary restraining order"; it was, rather, a memorialization of plaintiffs' agreement to provide sufficient notice to the defendants if a potential order became actual, so that a hearing on equitable relief could be scheduled and held, and a decision reached on the merits of defendants' demand for such relief. Had this order constituted a temporary restraining order, it would: 1) have so stated, with the appropriate precatory language; and 2) would not have referred to "further proceedings re. defendants' motion for temporary restraining order  .  .  .  ."

Defendants withdrew the motion for a temporary restraining order/preliminary injunction on March 12, 2007 [Doc. 21].

Cases interpreting Ohio product disparagement claims point out that to prevail, "a plaintiff must show that the defendant made a *false representation of fact*." *Northeast Ohio Coll. of Massotherapy v. Burek*, 144 Ohio App. 3d 196, 205 (2001) (emphasis in original). Such statements contrast with otherwise "protected statement[s] of opinion." *Id.* In deciding whether a statement is a protected opinion or an actionable factual assertion, a court must look at the totality-of-circumstances, but should focus on four issues: "(1) the specific language used in the assertion, (2) whether the statement is verifiable, (3) the general context of the statement, and (4) the broader context in which the statement appears." *Id.* at 206 (citing *Scott v. News-Herald*, 25 Ohio St. 3d 243, 250 (1986)).

Looking at defendants' specific language, Ohio courts have deemed statements that plaintiffs "would go bankrupt," *Id.* at 207, or were "near insolvency," *Ohio Savings Assn. v. Bus. First of Columbus, Inc.*, 43 Ohio App. 3d 215, 216 (1988), to be protected opinions. While potentially inflammatory, these statements were qualified and/or unverifiable. *See, e.g.*, *Burek*, *supra*, 144 Ohio App. 3d at 207 ("Burek did not allegedly state that the appellants were bankrupt but that they *would go bankrupt*, which is a critical distinction."). *Contra Laurel Valley Oil Co. v. 76 Lubricants Co.*, 154 Ohio App. 3d 512, ¶¶ 8-9, 33 (2003) (holding that because "reasonable minds could differ" regarding that actions and implications of defendant's statement that plaintiff "was failing financially and would go out off business," summary judgment was inappropriate on plaintiff's Ohio Deceptive Trade Practices claim).

Applying the totality-of-circumstances and four factor test to the first set of ATC's statements, I find that the cease and desist letter – and related threats to file suit – do not meet the requirements outlined in *Burek*. The complaint does not allege that defendants stated a fact or

35

opinion; rather, it alleges that ATC threatened White Mule in the presence of a potential buyer. Such a threat is, by its nature, not verifiable. Furthermore, the broader context in which defendants made the statement – at a private meeting with the plaintiffs – indicates that it was not the type of statement that § 4165.02(10) aims to prohibit or punish.

Regarding the second set of statements, I reach a similar conclusion. ATC's comments that "any final decision of this Court was years away, and  .  .  .  that ATC and ACS would ultimately prevail on the merits" are unverifiable statements of opinion. [Doc. 38 at ¶ 61]. These statements do not disparage the plaintiffs' "goods, services, or business" as much as they attack White Mule's legal posture. *Cf. Fairfield Mach. Co., Inc., v. Aetna Casualty and Surety Co.*, 2001 WL 1665624, *6 (Ohio App.) (explaining that a defamatory statement impugned a party's integrity; commercial disparagement claims are limited to statements that directly target goods or services); *Blue Cross & Blue Shield of Ohio v. Schmidt*, 1996 WL 71006, *3 (Ohio App.) (distinguishing between statements disparaging plaintiff's integrity and statements disparaging plaintiff's quality of services).

I come to a different conclusion regarding ATC's statement that I provided it with a temporary restraining order. Any restraint imposed by my order was self-imposed by White Mule, as part of an agreement between it and defendants. If defendants wanted the order denominated as a temporary restraining order, they should have asked me to include the appropriate language. They did not do so.

At this stage of the litigation the specific language of ATC's comment is unknown. The allegations, however, indicate that it was made in the context of a discussion about the litigation and ATC's expectation of success. Therefore, it seems possible that such statement was made, and interpreted, as a legal term of art (*i.e.*, "we received a temporary restraining order meaning the court

36

held that we made a showing that met the requirements for such an order"). In this regard it was verifiably false. Thus, I deny the motion to dismiss with regard to the defendants' statement that I issued a temporary restraining order.

Plaintiffs contend that the right to recover for defendants' disparaging comments go beyond the protections afforded under Ohio's Deceptive Trade Practices Act and extend to comments that are otherwise actionable at common law or under other sections of the Revised Code. *See* O.R.C. § 4165.02(C). I find no support for a common law claim that provides broader protections than Ohio's statute. Furthermore, because "a common law unfair competition claim is evaluated using the same analytical framework as a claim under the Deceptive Trade Practices Act," *RE/MAX Int'l Inc. v. Realty One, Inc.*, 924 F. Supp. 1474, 1503 (N.D. Ohio 1996), I dismiss Count Fifteen to the same extent as I dismiss Count Twelve..

For these reasons, I dismiss plaintiffs' product disparagement and unfair competition claims except to the extent that plaintiffs allege a claim relating to defendants' statement that I issued a temporary restraining order.

### 2. Product Disparagement Under the Lanham Act

Count Thirteen alleges that ATC's statements violated the Lanham Act, 15 U.S.C. § 1125(a)(1), which provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
>
> *   *   *
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

37

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

This section of the Lanham Act usually applies to advertising. In the rare cases that do not involve traditional advertising, courts in this circuit have still applied false advertising precedents. *See, e.g.*, *Kan. Bankers Surety Co. v. Bahr Consultants, Inc.*, 69 F. Supp. 2d 1004, 1012-14 (E.D. Tenn. 1999) (applying the circuit's commercial advertising or promotion precedents to statements in a consultant's work product).

White Mule attempts to bring a general "product disparagement" claim under the Lanham Act. It appears, however, that the Act is limited to statement made via "commercial advertising or promotion." *See Id.* at 1012.

To state a cause of action for disparagement through "promotion," the Sixth Circuit requires a showing that:

> 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff.

*Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery*, 185 F.3d 606, 613 (6th Cir. 1999).

White Mule's Lanham Act claim faces three initial hurdles in meeting these elements. First, courts in this circuit have struggled to define commercial speech. *See, e.g.*, *Semco v. Amcast, Inc.*, 52 F.3d 108, 111-14 (6th Cir. 1995); *Kan. Bankers Surety Co.*, *supra*, 69 F. Supp. 2d at 1012-14. Second, even if the speech in question is "commercial" it still must serve the purposes of "advertising or promotion." Finally, plaintiffs must again show that defendants made "statements of fact" and that those statements were false or misleading.

38

As an initial matter, I must evaluate whether ATC's statements constitute commercial speech. In *Semco*, the Sixth Circuit noted that the House "apparently intended to limit the application of the Lanham Act strictly to 'commercial speech' as that phrase has been defined in the constitutional jurisprudence of the Supreme Court." 52 F.3d at 111 (explaining that by limiting the reach of the Lanham Act to "false and misleading speech that is encompassed within the [Supreme Court's] 'commercial speech' doctrine," the House intended to guarantee its Constitutionality).

In contrast, the Senate believed that the "commercial" limitation only prevented the Act from restricting political speech. *Id.* at 111-12. Because the statement in *Semco* arguably met both definitions, the court refrained from "attempting to divine the true meaning of 'commercial advertising and promotion.'" *Id.* at 112. The speech was not political and it met the Court's commercial speech standards set out in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983).

Examining the two sets of statements made by ATC, it appears the alleged comments constitute "commercial speech." *See id.* at 66-67 (finding that a court could characterize the speech in question as "commercial" because it: was economically motivated; referenced a specific product; and defendant admitted it was advertising); *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1111 (C.D. Cal. 2004) (describing the *Bolger* factors as "(1) whether the statements are in a typical advertising format; (2) whether the statements refer to a commercial product; and (3) whether the defendant had an economic or commercial motivation for making the statements").

The statements do not, however, constitute "commercial advertising or promotion" under the Lanham Act, which requires such speech to be:

(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the

39

representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Kan. Bankers Surety Co.*, *supra*, 69 F. Supp. 2d at 1012 (quoting *Gordon & Breach Science Publishers*, *supra*, 859 F. Supp. at 1535-36 (S.D.N.Y. 1994)).

The private conversation between representative of ATC and White Mule – regardless of the content and third party presence – did not aim to influence consumers and was not disseminated sufficiently to constitute advertising or promotion. With regard to statement set two, the aim was not to persuade consumers to buy defendants' good and, most significantly, defendant ATC is not in commercial competition with plaintiffs.[19]

I, therefore, dismiss plaintiffs' Lanham Act claims.

### 3. Defamation

In Ohio, a defamation claim, which plaintiffs assert in Count Fourteen, must allege:

1) a false and defamatory statement concerning another; 2) an unprivileged publication to a third party; 3) fault amounting at least to negligence on the part of the publisher; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Fitzgerald v. Roadway Express, Inc.*, 262 F.Supp.2d 849, 855 (N.D. Ohio 2003) (citing *Akron-Canton Waste Oil, Inc., v. Safety-Kleen Oil Servs., Inc.*, 81 Ohio App.3d 591, 601 (1992)); *see also Brown v. Lawson*, 169 Ohio App. 3d 430, ¶ 9 (2006) (containing a similar list of elements).

---

[19]

Even if the plaintiffs' claims cleared the "commercial advertising or promotion" hurdle, most of ATC's comments would still not meet the "opinion versus fact" requirements set out in *American Council of Certified Podiatric Physicians and Surgeons*. Assuming that ATC's statements were literally false (thereby avoiding the requirement of alleging that it was a statement that "actually or tends to deceive a substantial portion of the intended audience"), the alleged comments were still unconfirmable opinions that did not constitute "false or misleading statements of fact." *Am. Council*, *supra*, 185 F. 3d at 613-15.

The statement must also be one of fact and not opinion. *Vail v. The Plain Dealer Publ'g Co.*, 72 Ohio St.3d 279, 281-82 (1995); *Brown*, *supra*, 863 Ohio App. 3d at ¶ 15 ("The Ohio Constitution protects statements of opinion.").

Whether an alleged defamatory statement is one of fact or opinion is a question of law. *Vail*, *supra*, 72 Ohio St.3d at 280 (reinstating dismissal of defamation complaint for failure to state a claim); *see also SPX Corp. v. Doe*, 253 F. Supp. 2d 974, 978 (N.D. Ohio 2003) (explaining that because the privilege accorded opinions presents a legal question "it is appropriate to decide these issue in the context of a motion pursuant to Rule 12(b)(6)").

Courts apply a totality of circumstances test, considering "the specific language used, whether the statement is verifiable, the general context of the statement, and finally the broader context in which the statement appeared." *Vail*, *supra*, 72 Ohio St.3d at 282; *see also Wampler v. Higgins*, 93 Ohio St.3d 111, 121-22 (2001) (refusing to limit Ohio's categorical protection for opinions to opinions expressed in the press).[20]

Promises, threats, or comments during negotiations are more akin to opinion than fact. As in this case, they are often presented in a context of future action and are therefore inherently unverifiable. *See SPX Corp.*, *supra*, 253 F. Supp. 2d at 980-81 ("A statement is deemed verifiable if: (1) the author represents that he has knowledge of evidence that substantiates the statements and

---

[20]

Plaintiffs cite a case from 1834 to support the proposition that false accusations of patent infringement are libelous. *Watson v. Trask*, 6 Ohio 531 (1834).

I acknowledge that defendants' statement that they would succeed on the merits is similar to an accusation of infringement. In my view, current jurisprudence distinguishing fact from opinion trumps the argument that all statements alleging patent infringement are libelous per se. In the proper situation, a factual statement that one party is infringing a patent could be libelous. A statement reflecting one's opinion on the issue (not to mention a statement reflecting one's opinion on the strength of a case deciding the issue) is not such a situation.

41

(2) there is a plausible method to verify the statements."). Furthermore, such statements are often

part of larger negotiation tactics and gamesmanship. *Cf. id.* at 981 ("Also important is the tenor,

including whether the statements appear in a piece characterized by objective facts or subjective

hyperbole."). While we do not know the specific language used in statement set one, I find that there

is enough information about the context and verifiability of the statements to deem them opinions

rather than facts.

Statement set two (with the exception of the temporary restraining order comment) consists

of comments that are equally unverifiable. Listeners would almost certainly interpret these

comments – by representatives of the defendant engaged in the litigation they described – as biased

efforts to convince White Mule's customers of the strength of ATC's case. Furthermore, the context

is one in which listeners to such comments would characterize them as opinion, hyperbole, or even

puffery.[21]

Defendants' comment about the temporary restraining order stands in contrast to the

commentary about actions to be taken in the future and predictions regarding ongoing litigation. If

interpreted as a fact about a legal ruling, the statement that I granted the defendants a "temporary

restraining order" was verifiably false. The context of the statement – a discussion of ongoing

litigation – only supports the argument that I should interpret the statement as its legal meaning

requires. *See McKimm v. Ohio Elections Comm'n*, 89 Ohio St.3d 139, 146 (2000) (explaining that

---

[21]

Plaintiffs assert that ATC's statement that it would prevail on its patent infringement claim was
verifiably false because the patents were invalid. Even if the patents were invalid, however, this
allegation does not change ATC's statement that it would prevail from being unverifiable (nor does
it alter the context in which listener's perceived ATC's statement). Furthermore, ATC's certain
knowledge that it had fraudulently obtained the patents and that it could not prevail would not
change the comments themselves from being statements of opinion rather than fact.

the "innocent-construction rule" only applies to statements that "are *reasonably* susceptible to an innocent construction."); *Roe ex rel. Roe v. Heap*, 2004 WL 1109849, at \*10-11 (Ohio App.) (use of the words "convicted sexual offender" not "substantially true" as they "inflict[ed] a 'sting' and convey[ed] a 'gist' substantially more injurious than" what actually occurred in the juvenile proceedings) . *But cf. Bruss v. Vindicator Printing Co.*, 109 Ohio App.3d 396, 400 (2006) (holding that the term "charged" as used in a news article did not necessarily mean criminally charged but could also mean "accused").

Based on the allegations, the statement also meets the remaining requirements for an Ohio defamation claim. Under Ohio law, any communication to a third party constitutes "publication." *See, e.g.*, *Hecht v. Levin*, 66 Ohio St.3d 458, 460 (1993). ATC bears fault amounting at least to negligence – it knew that it had requested a temporary restraining order and that the conference did not result in a temporary restraining order. While arguable per se defamatory, White Mule also claims harm in the form of lost business.

For these reasons, I dismiss plaintiffs' defamation claims except the extent that plaintiffs claims relate to defendants' statement that I issued a temporary restraining order.

### 4. Breach of Contract

Count Sixteen alleges breach of contract. In Ohio, a breach of contract claim must allege: "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Powell v. Grant Med. Ctr.*, 148 Ohio App.3d 1, 10 (2002) (quoting *Nilavar v. Osborn*, 137 Ohio App.3d 469, 483 (2000)).

Plaintiffs claim that ATC purchased $49,658.17 worth of goods from White Mule, White Mule delivered approximately $46,961.17 of these goods to ATC and had remaining goods ready

43

for delivery, and that ATC refused delivery of the remaining goods and failed to pay the $49,658.17 it owed to White Mule. These claims allege the existence of a contract and a breach of that contract. *See, e.g.*, *Nilavar*, *supra*, 137 Ohio App.3d at 483 ("A contract is an agreement, upon sufficient consideration, between two or more persons to do or not to do a particular thing." (quoting *Lawler v. Burt*, 7 Ohio St. 340, 350 (1857))). I deny defendants' motion to dismiss the breach of contract claim.

## Conclusion

For the foregoing reasons, it is therefore

ORDERED THAT

1. The defendants' motion to dismiss [Doc. 44] be, and the same hereby is, granted with the exception of plaintiffs' claims for: 1) *Walker Process* attempted monopolization of Relevant Market Two; 2) product disparagement, unfair competition, and defamation based on defendants' statement that I granted a temporary restraining order; and 3) breach of contract.

2. A telephone status/scheduling conference is set for April 21, 2008 at 10:30 a.m.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge

44